Filed 5/26/23  P. v. McGrady CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MONA MARIE MCGRADY,<br><br>    Defendant and Appellant. | F082258<br><br>(Super. Ct. No. CRF59904)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Mouzis Criminal Defense and Jennifer Mouzis for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 2020, a jury convicted appellant Mona Marie McGrady of two counts of lewd and lascivious conduct with a 15-year-old female victim (Pen. Code, § 288, subd. (c)(1);[1] counts VIII and XII). The jury also convicted appellant of sexual penetration by a foreign object of that same victim when the victim was under 18 years of age (§ 289, subd. (h); count XIV). Although the jury convicted appellant of those three charges, it found her not guilty in nine other counts which had alleged other instances of lewd and lascivious conduct with the same victim. The trial court sentenced appellant to an aggravated prison term of four years four months. This consisted of an upper term of three years in count VIII, and two consecutive subordinate terms (one-third the midterm) of eight months.

Appellant raises two claims. First, she contends that her judgment must be reversed because the jury heard about Child Sexual Abuse Accommodation Syndrome (CSAAS), which she asserts was not relevant in this matter. Second, appellant argues that the trial court abused its discretion when it denied a motion for new trial based on alleged insufficient evidence supporting the conviction in count VIII. We affirm.

## BACKGROUND

We summarize the material trial facts that support appellant's judgment. We provide additional facts later in this opinion when relevant to the issues raised.

### I. Former Students Recall Appellant's Actions as a Coach and Teacher.

In the 1990's, appellant taught and coached at a Christian-based high school in Tuolumne County. She had a reputation for being affectionate and giving hugs to students. In particular, she was extra attentive to three female students: (1) the victim[2] in

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] At trial, the victim was known as Jane Doe 1. To avoid any confusion with Jane Doe 2, we will refer to the victim in this opinion as "the victim."

this matter; (2) a woman known at trial as Jane Doe 2; and (3) a final woman whom we identify as A.M.[3] These three individuals had been star athletes at this high school.

Former students testified that appellant had engaged in behavior with the victim, Jane Doe 2 and/or A.M. that they now considered to be inappropriate, such as being alone with one of them in a locked room or being very affectionate with them in public. A former teacher testified that, on one occasion, she knocked on appellant's locked office door, and she heard A.M.'s voice inside. She heard appellant say, "Does this feel good."

Former students testified that, on various trips away from school, they observed appellant and the victim sleeping together in a bed and, on other occasions, in a sleeping bag. By the time the victim was a senior in high school, it appeared to some students that she was in a relationship with appellant. However, none of the former students ever saw appellant engaging in sexual activity with either the victim, Jane Doe 2, or A.M. Likewise, various defense witnesses also told the jury that they never saw appellant inappropriately touch a student.

## II. The Victim's Parents Express Concern to the School.

The victim's parents observed that, when the victim was a minor, appellant spent a lot of time with her. Appellant would often have long conversations with the victim at night on the telephone. The victim's father testified that the calls started when the victim was in seventh or eighth grade, and they occurred about three times a week. The mother testified that the victim and appellant spoke with each other daily on the telephone.

Around the victim's freshman year in high school, her parents placed restrictions on how much time she could see appellant. The victim's parents also met with the school's principal, and then with the school's athletic director. They complained that appellant was having an unhealthy emotional relationship with the victim. However,

---

[3] A.M. did not testify in this matter. In 1996, she was involved in a serious auto accident, which left her with disabilities stemming from a traumatic head injury.

their concerns were not taken seriously and no action was taken.[4] At trial, the victim's mother told the jury that she had observed behavioral changes in the victim when she was in high school. The mother believed that appellant had been responsible for those changes.

### III. Appellant's Abuse of the Victim.

The victim graduated from high school in 1998. She was born in January 1980, and she was 40 years old at the time of trial. In high school, appellant was her coach in various sports. The victim informed the jury that, when she was in school, her relationship with appellant evolved to the point that they began to touch each other sexually. The sexual contact continued for a short period after the victim was 18 years old and had graduated from high school, but the victim soon stopped the relationship.

In or around 1999, the victim disclosed some of the abuse to a friend, but she was very vague about what had happened. In 2014, about 16 years after graduating from high school, the victim confronted appellant about some of the past abuse. This confrontation occurred in an arranged meeting, and other people were present. Appellant denied any wrongdoing.

After confronting appellant in 2014, the victim did not contact law enforcement. Instead, she gave a narrative account of what had happened to a former elder's wife at the church the victim had attended, who recorded her statements. In or around 2018, law enforcement was alerted about these allegations, and it started an investigation. In May 2019, the present charges were filed against appellant.

At trial, the victim testified that the inappropriate contact with appellant occurred on many occasions and in numerous locations when she was a minor. She told the jury

---

**4** At trial, the athletic director denied ever seeing appellant doing anything inappropriate with a student, including the victim. He could not recall the victim's parents ever coming to him with concerns about appellant.

that, at times, appellant made her orgasm by touching her vagina. The victim also believed that appellant had orgasmed on multiple occasions with her while appellant was rubbing her vagina against the victim's body.

Both before and during trial, the victim detailed numerous incidents with appellant, three of which supported the convictions in this matter. First, when the victim was 15 years old, she and appellant engaged in sexual activity in appellant's home, such as appellant rubbing herself on the victim's leg. On another occasion when the victim was 15 years old, appellant rubbed her vagina on the victim's leg when they were in appellant's school office during the basketball season. Finally, appellant digitally penetrated the victim's vagina with her finger while they were in a hotel room. This occurred during a basketball tournament in Modesto, California, before the victim turned 18 years old. These incidents supported the guilty verdicts in counts VIII, XII and XIV, respectively.

## IV. The Victim's Trial Testimony was Impeached Regarding the Veracity of her Memories.

At trial, the defense was able to impeach the victim regarding the reliability of many of her various memories. Prior to law enforcement's investigation, the victim gave a lengthy recorded narrative to a former elder's wife at the church the victim had attended about some of the abuse she had suffered. Prior to trial, the victim also prepared a timeline for law enforcement.[5] In many instances, the victim's prior accounts substantially contradicted her trial testimony regarding when and where some of the charged abuse had allegedly occurred.

---

[5] The victim was also impeached at trial from her own felony conviction. The victim had been previously convicted of her own sex crime with an underaged male. During closing argument, appellant's trial counsel asserted that the victim had attempted to minimize her own criminal conduct when testifying in this matter, which impacted her credibility.

Appellant told the jury that she never touched the victim inappropriately. During closing argument, the defense asserted that appellant was innocent, and she should be found not guilty in all counts. Appellant's trial counsel persuasively argued to the jurors that the victim's trial testimony was too inconsistent to support a majority of the charges, a vast majority of which required the prosecution to prove that the victim was 14 or 15 years old at the time of the alleged lewd and lascivious conduct. (See § 288, subd. (c)(1).) The defense also argued to the jurors that the victim's memories had been "corrupted" over time from various sources, including discussing the allegations with others.[6] The jury found appellant not guilty in nine of the 12 counts it was asked to consider.

We do not summarize the voluminous trial evidence regarding the nine charges in which appellant was acquitted. We note, however that the trial court stated at sentencing that many of the charged crimes required the jury to make a finding that the victim had been a certain age. The court commented that, on the majority of the counts where the jury found appellant not guilty, a dispute had existed more about when events had happened as opposed to whether they had occurred. In her reply brief, appellant likewise notes that the primary question for jurors to decide in this matter was not what conduct had occurred, but when it had occurred, relative to the victim's age. Appellant admits that "considerable evidence" was introduced at trial demonstrating that she had engaged in "a same-sex relationship at some point" with the victim when the victim was in high school.

---

[6]     At trial, evidence demonstrated that some of the victim's and Jane Doe 2's friends had discussed the alleged abuse through social media platforms. Some of those friends had explored how they could provide information to the local district attorney's office so it would proceed with this prosecution. One of those friends admitted at trial that, before the criminal charges were filed against appellant, they were trying to act as "advocates" for the victim and Jane Doe 2.

## V. Jane Doe 2's Testimony.

Jane Doe 2 testified at trial about alleged abuse she had suffered from appellant. Jane Doe 2 was 41 years old when she testified. The jury was instructed that Jane Doe 2's testimony regarding her alleged abuse was admitted for the limited purpose to show appellant's possible intent, motive, and/or a plan or scheme for the charges involving the victim.

Jane Doe 2 told the jury that she had spent considerable time with appellant when she was a teenager. This included lengthy telephone calls, time spent alone with appellant in her locked office, and overnight trips. According to Jane Doe 2, their relationship became intimate while she was still a minor. The alleged inappropriate contact occurred in numerous locations, including appellant's school office and when they were traveling together. Jane Doe 2 informed the jury that appellant touched her breasts, and they touched each other below the waist. At times, appellant would "dry hump or ride" her until appellant would orgasm. However, they were always clothed and no penetration ever occurred.

In 2001, Jane Doe 2 confronted appellant about the alleged abuse during a meeting in which others were present. Appellant denied any wrongdoing.[7] That same year, Jane Doe 2 reported her allegations to law enforcement. Although law enforcement started an investigation, no charges were ever filed against appellant regarding Jane Doe 2's allegations. At trial, appellant denied ever touching Jane Doe 2 inappropriately.

## VI. Jane Doe 2's Father Expressed Concerns about Appellant's Behavior.

The jury learned that, in or around 1995, Jane Doe 2's parents met with appellant and expressed concerns about the amount of contact she was having with Jane Doe 2.

---

[7] In 2001, the victim learned that Jane Doe 2 was coming forward with allegations against appellant. At that time, however, the victim declined to come forward with her own allegations. That same year, the victim declined to speak with law enforcement regarding its investigation of Jane Doe 2's allegations.

Appellant signed a contract that was designed to limit the amount of contact she could have with Jane Doe 2. Jane Doe 2's father told the jury that he had created this contract because he had wanted to establish some distance between appellant and his daughter. He had felt that his daughter was being manipulated by appellant, and he was losing her.

**VII. Appellant's Resignation from the School.**

In 2001, a former administrator at the high school became aware of alleged misconduct involving appellant. This administrator wrote a letter that year to the school board recommending appellant's termination. In April 2001, appellant submitted her resignation, which was accepted.

**VIII. Expert Testimony Regarding CSAAS.**

Both the prosecution and the defense elicited expert testimony regarding CSAAS. The prosecution's expert, Blake Carmichael, testified in this matter before either the victim or Jane Doe 2 took the witness stand. Carmichael is a clinical psychologist, and he provided an overview of CSAAS to the jury, including its five components. He testified that CSAAS is not used to diagnose whether abuse had occurred. Instead, it was designed to dispel myths regarding how an abused child might be expected to act. In part, it is common for an abused child to delay reporting the abuse.

The defense called Alex Yufik, a forensic psychologist who also had graduated from law school. Yufik was designated as an expert in this trial in the area of memory. Yufik explained that the scientific community had not accepted all of the components of CSAAS. Yufik testified that it was accepted that child abuse frequently results in a delayed disclosure, which is a process and not a single event. However, although a delayed disclosure is accepted by the scientific community, the remaining four components of CSAAS are not supported by valid scientific research.

Yufik explained that memory is a reconstruction, and memory can be manipulated. Details become confused with the passage of time. Generally, the longer the delay, the less accurate a memory becomes.

## DISCUSSION

I.      **The Trial Court Did Not Abuse Its Discretion in Permitting Introduction of the CSAAS Evidence; Appellant has Forfeited a Portion of this Claim and any Presumed Error is Harmless.**

Appellant contends that her judgment must be reversed because the jury heard about CSAAS, which she asserts was not relevant in this matter. She also maintains that Carmichael should not have testified before the victim or Jane Doe 2 took the witness stand. According to appellant, admission of this evidence violated her right to due process and a fair trial, and it was prejudicial.

A.      **Background.**

1.      **The motions in limine.**

Prior to trial, the prosecution filed an in limine motion seeking authorization to introduce into evidence expert testimony regarding CSAAS. The defense filed its own motion in limine on this topic, requesting the court to exclude all testimony about CSAAS. In the alternative, the defense asked the court to limit such testimony and provide a limiting instruction to the jury.

At oral argument, the defense objected to this testimony unless the trial evidence first established that a possible myth or misconception existed regarding how an abused child might act. The prosecutor indicated his intention to limit Carmichael's proposed testimony to the basic concepts of (1) late reporting; (2) a victim repeatedly going back to a perpetrator; and (3) a victim not being able to clearly elucidate the molestations in great detail. The prosecutor asserted that these concepts were part of CSAAS and were germane to this case. The trial court agreed that Carmichael could testify in this matter

9.

but his testimony could not cover any part of CSAAS that was not relevant. The court also wanted the victim and Jane Doe 2 to first testify to lay a foundation.

The prosecutor alerted the court that Carmichael would need to testify out-of-order because he was only available on a specific date. The defense requested the opportunity for its own expert, Yufik, to also testify out-of-order if Carmichael did so. The court was agreeable so long as the parties worked out a schedule.

Before concluding the hearing, the court stated that the prosecutor could ask Carmichael about any part of CSAAS that the prosecutor believed would come into evidence and the prosecutor was willing to make an offer of proof. The court stated it was okay for Carmichael to testify in general about the five components of CSAAS. Questions could then be posed to Carmichael about those concepts that might apply in this matter.

### 2. Additional details about Carmichael's trial testimony.

At trial, Carmichael explained to the jury the five components of CSAAS. Those are (1) secrecy; (2) helplessness; (3) entrapment or accommodation; (4) delayed, unconvincing or conflicted disclosure; and (5) recanting or retraction. Carmichael stated that not all five components are required to exist. He explained that children can stay in a relationship with an abuser. Behavior may become normative over time so the child does not realize there is something to report. According to Carmichael, people sometimes believe a child's version of events should be consistent every time the abuse is disclosed. However, that is very difficult, especially when the abuse happens multiple times over months or even years.

Carmichael told the jury that he had not read any police reports in this matter, and he had neither interviewed anyone nor saw any videos. He did not know any facts about this case. He testified that he had no idea if the victim or Jane Doe 2 were ever molested or not, and that issue was "up to the jury." He explained that there is no checklist to

10.

determine veracity. He testified that he is "not in a position to decide if something happened or not." Instead, he shares information about his field.

Carmichael testified that there is no diagnosis of sexual abuse. CSAAS does not predict who has been abused. Instead, these concepts are derived from studying children who had been abused. CSAAS is not used to determine the veracity of an allegedly abused victim's statements.

During this testimony, the prosecutor posed no hypotheticals to Carmichael, and Carmichael did not address any case specific facts.

**B.     Standard of review.**

An abuse of discretion standard is used to review a trial court's evidentiary ruling. (*People v. Jones* (2017) 3 Cal.5th 583, 609.) We will not reverse such a ruling unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*Ibid.*; see also *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse of discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

**C.     Analysis.**

Appellant contends that the CSAAS evidence was not relevant to the facts of this case, and the trial court should have excluded it. She asserts that none of the five components of CSAAS applied in this matter. For instance, appellant notes that neither the victim nor Jane Doe 2 ever recanted their allegations. Appellant also argues that her "romantic" relationships with the victim and Jane Doe 2 were not a secret, and neither the victim nor Jane Doe 2 ever felt helpless or trapped because they wanted to be with appellant. Appellant also maintains that the victim and Jane Doe 2 did not necessarily delay in reporting their respective abuse. Appellant notes that the victim first disclosed her concerns to a friend as early as 1999, and Jane Doe 2 first disclosed her concerns to a friend about two years after graduating from high school.

11.

In raising the present claim, appellant cites various academic and legal sources that call into question the validity of CSAAS. She notes that a scholar has called CSAAS a " 'junk science' " that should not be used in a legal setting. Appellant argues that the CSAAS evidence was improperly used in this matter to bolster the victim's credibility. She contends that presenting CSAAS testimony before the victim testified permitted the jurors to ignore the victim's impeached testimony from her numerous inconsistencies. Appellant argues that Carmichael's testimony allowed the jury to conclude that the victim was sexually abused and that her "wildly inconsistent testimony" was either excused or expected because of CSAAS.

We reject appellant's various arguments. She has forfeited her claim that the trial court erred in permitting Carmichael to testify prior to the victim or Jane Doe 2. In any event, we also conclude that the trial court did not abuse its discretion in permitting admission of Carmichael's expert testimony, and any presumed error is harmless.

### 1. Appellant has forfeited her claim that the trial court erred in permitting Carmichael to testify prior to the victim or Jane Doe 2.

We agree with respondent that appellant has forfeited her claim that the trial court erred in permitting Carmichael to testify prior to the victim. When a trial court makes an in limine ruling that certain evidence is admissible, the party seeking exclusion must still object during trial when the evidence is actually offered to preserve the issue for appeal. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159; *People v. Brown* (2003) 31 Cal.4th 518, 547.)

Here, the trial court granted the prosecution's motion in limine to permit expert testimony regarding CSAAS. The court stated it was okay for Carmichael to testify in general about the five components of CSAAS. Questions could then be posed to Carmichael about those concepts that might apply in this matter. The court also agreed

that the parties could call their respective experts out-of-order, and the court directed the parties to "figure that timing out" as that day approached.

When Carmichael took the witness stand, neither the victim nor Jane Doe 2 had testified. The defense, however, did not object regarding the timing of Carmichael's testimony. Appellant concedes in her reply brief that the defense never raised a specific objection to the timing of Carmichael's testimony, only that this issue was discussed during the in limine hearing. Because the defense did not object to the timing of Carmichael's testimony, that component of appellant's claim is deemed forfeited. In any event, however, we also reject the entirety of this claim on its merits.

**2.      The trial court did not abuse its discretion.**

Evidence regarding CSAAS allows jurors to understand the behavior of children who have been the victims of sexual abuse. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069.) CSAAS evidence is admissible to dispel certain myths about the typical behavior of childhood victims of sexual assault. However, such evidence is inadmissible to prove that a victim's claim of molestation is true. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)

A trial court is required to control the proceedings and to limit the introduction of evidence to relevant and material matters. (§ 1044.) Relevant evidence is defined as having a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Expert witness testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

This record does not demonstrate or even reasonably suggest that the court's evidentiary ruling was arbitrary or devoid of reason. We disagree with appellant's assertion that the CSAAS evidence was not relevant in this matter. The prosecutor

13.

explained to the court during the in limine hearing what evidence he hoped to elicit from Carmichael and why. The prosecutor's offer of proof demonstrated that Carmichael's proposed testimony about CSAAS had a tendency in reason to prove or disprove disputed facts that were of consequence. (Evid. Code, § 210.) Further, Carmichael's proposed expert testimony involved a topic that was sufficiently beyond common experience that his opinion would assist the jury. (Evid. Code, § 801, subd. (a).) Thus, the CSAAS evidence had probative value, and the court had ample grounds to conclude that this testimony was relevant.

Appellant relies on *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*). In *Clotfelter*, as in the present matter, Carmichael testified as an expert witness regarding CSAAS. According to appellant, Carmichael's testimony in the current case was similar to his testimony in *Clotfelter*, and the trial court should have excluded it here. We disagree that *Clotfelter* establishes an abuse of discretion in the present matter.

In *Clotfelter*, the defendant was convicted in the 1980's of multiple counts of child molestation, and he was sentenced to prison. He served his sentence and was released from prison. However, he was found to be a sexually violent predator, and he was held in a state hospital. He eventually agreed to be surgically castrated, and, in 2007, he was released from the state hospital. (*Clotfelter*, *supra*, 65 Cal.App.5th at p. 37.) In 2016, the defendant was charged with new crimes. A jury eventually found him guilty of two counts of annoying or molesting a child under the age of 18, two counts of contacting or communicating with a 14 or 15-year-old child with the intent to commit a sexual offense, and two counts of contacting or communicating with a child under the age of 14 with the intent to commit a sexual offense. (*Id.* at pp. 37–38.)

On appeal, the First Appellate District, Division Two, reversed two of the defendant's convictions for insufficient evidence. (*Clotfelter*, *supra*, 65 Cal.App.5th at p. 38.) The appellate court also concluded that the defendant's trial counsel had rendered

ineffective assistance of counsel. (*Ibid.*) As part of its analysis regarding ineffective assistance of counsel, the *Clotfelter* court examined the expert testimony that Carmichael had provided in the prosecution's case against the defendant. (*Id.* at p. 62.) Defense counsel had raised no objections to the CSAAS testimony. (*Ibid.*) However, the appellate court concluded that the CSAAS evidence had had little or no relevancy. Setting aside the two counts that were reversed for insufficient evidence, the victims had not reported any abuse. (*Id.* at pp. 64–65.) The appellate court determined that no tactical reason had existed for defense counsel to not seek exclusion of the CSAAS testimony. (*Id.* at p. 65.) Further, the prosecutor had argued to the jury in a way that used the CSAAS testimony to infer that the victims had been sexually abused. (*Ibid.*) The *Clotfelter* court held that the ineffective assistance of counsel was prejudicial. (*Ibid.*) Based on this ineffective assistance, and other concerns stemming from defense counsel's representation, the court reversed the judgment and remanded the matter for further proceedings. (*Id.* at p. 70.)

In the present matter, and unlike what occurred in *Clotfelter*, the victim accused appellant of repeated and prolonged incidents of abuse when she was a minor. The victim underwent a lengthy period of delay until she brought her allegations to law enforcement. The victim had difficulty recalling details, and her various accounts of the alleged abuse had, at times, substantial inconsistencies. As such, and contrary to *Clotfelter*, we cannot declare that the CSAAS evidence had no relevancy in this trial. Instead, Carmichael testified that not all five components of CSAAS are required for this syndrome to exist. His expert testimony may have assisted the jury in better understanding the victim's complex relationship with appellant, why the victim may have delayed in reporting the abuse, and why the victim may have had difficulty in recalling details with accuracy. The CSAAS evidence tended to demonstrate that the victim's conduct was not inconsistent with that of someone who had been abused, and it gave the

jurors a method to evaluate the victim's credibility. (See CALCRIM No. 1193.) *Clotfelter* is distinguishable.

Moreover, *Clotfelter* did not analyze whether or not the trial court abused its discretion in permitting introduction of the CSAAS evidence. Instead, the CSAAS evidence in *Clotfelter* was analyzed solely as part of an ineffective assistance claim. Cases are not authority for propositions not considered or decided. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134.) Consequently, *Clotfelter* is inapposite here and it does not establish that appellant's judgment should be reversed.

Based on this record, the trial court did not exercise its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (See *People v. Jones*, *supra*, 3 Cal.5th at p. 609 [setting forth this standard].) Likewise, the court's evidentiary ruling did not fall outside the bounds of reason under the applicable law and relevant facts. (See *People v. Williams*, *supra*, 17 Cal.4th at p. 162 [setting forth this standard].) Consequently, an abuse of discretion is not present and this claim fails. In any event, however, we also conclude that any presumed error is harmless.

### 3. Any presumed error is harmless.

Appellant contends we should use the federal standard under *Chapman v. California* (1967) 386 U.S. 18, 23–24 (*Chapman*), to analyze prejudice. In the alternative, appellant asserts that, even under the state standard, reversal of her judgment is required under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). These arguments are without merit.

As an initial matter, it is proper to use *Watson*—and not *Chapman*—to analyze prejudice in this situation. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 180 [relying on *Watson* standard to analyze prejudice for erroneous admission of CSAAS expert testimony]; see also *People v. Prieto* (2003) 30 Cal.4th 226, 247 [applying *Watson* standard where expert testimony was erroneously admitted]; *People v. Bledsoe* (1984) 36

16.

Cal.3d 236, 251–252 [applying *Watson* standard where evidence of rape trauma syndrome erroneously admitted to prove victim was actually raped].) Under *Watson*, the question is whether it is reasonably probable appellant would have obtained a more favorable result in the absence of the alleged error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Carmichael repeatedly told the jury that he knew nothing about the victim or the facts of this case. He testified that he had no idea if the victim or Jane Doe 2 were ever molested or not, and that issue was "up to the jury." Further, Carmichael made it clear that CSAAS does not diagnose abuse or predict who has been abused. Instead, these concepts are derived from studying children who had been abused. CSAAS is not used to determine the veracity of an allegedly abused victim's statements. Finally, the prosecutor posed no hypotheticals to Carmichael, and he did not address any case specific facts.

The jury was instructed with CALCRIM No. 1193. This informed the jurors that neither Carmichael's nor Yufik's opinion testimony about CSAAS was evidence that appellant had committed any of the charged crimes against the victim, or the uncharged conduct with Jane Doe 2. The jury was told to consider this evidence only in deciding "whether or not" the victim's and Jane Doe 2's conduct "was not inconsistent with the conduct of someone who has been molested." The jury was also told it could consider this evidence to evaluate their credibility. This record does not demonstrate or even reasonably suggest that the jurors convicted appellant based on Carmichael's testimony.

Appellant does not raise an instructional challenge, but she asserts that CALCRIM No. 1193 contains confusing language and it "exacerbated the damage" from Carmichael's testimony prior to the victim taking the witness stand. We disagree. CALCRIM No. 1193 expressly informed the jurors that they could not use the CSAAS evidence to establish guilt. Furthermore, other instructions told the jurors that appellant was presumed innocent, and the prosecution bore the burden to prove her guilt beyond a reasonable doubt. The jurors were instructed that the People were required to prove not

17.

only that appellant did the acts charged, but that she also acted with a particular intent, which was provided with each crime. The jurors were informed that they alone must judge the credibility or believability of each witness. For each of the charged crimes, the jurors were told that the prosecution had to prove each of the required elements, which were provided. The jurors were told that they could reject any or all of each expert's opinion testimony. We presume the jurors understood and followed the trial court's various instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The totality of the instructions given to the jury amply demonstrate that the jurors would not have been confused, and it is not reasonably likely the jurors would have believed they could rely on the CSAAS evidence to establish appellant's guilt.

Finally, neither attorney argued this matter to the jury in a manner that reasonably suggested the jurors could use the CSAAS evidence to find appellant guilty. Instead, the prosecutor asserted that Jane Doe 2 had corroborated the claims alleged by the victim. The prosecutor stated that Carmichael had talked about abusers using authority or trust. The prosecutor also noted that delayed reporting was common, and it was a process. The prosecutor asserted that repeated molestation impacted an abused child's ability to keep a chronology, which Carmichael had explained.

The defense argued that the jurors should agree that kids can delay in reporting abuse, but the rest of CSAAS is not "scientific." The defense noted that Carmichael had never interviewed the witnesses, he had never read the reports, and he did not have any personal information. The defense asserted that Carmichael was not an expert in memory. The defense asked the jurors to find Carmichael lacking in credibility because he had fought defense counsel during questioning. Defense counsel reminded the jurors that Yufik had testified that memory is like a spring filled with water that gets muddier and muddier the longer it goes. Defense counsel argued that the victim's memory had

been corrupted over time from various advocates she had spoken with in the years leading up to trial.

The jurors found appellant not guilty in nine counts, and they only convicted her of three charges. It is abundantly clear that the jury carefully weighed the evidence. It is likewise very apparent that the jury carefully considered the arguments from defense counsel. Therefore, we reject appellant's assertions that her due process rights were violated by the introduction of the CSAAS evidence. Carmichael's expert testimony had probative value in this matter, and this trial was not rendered fundamentally unfair from this evidence. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 805 [due process is not offended by the admission of relevant evidence unless it is so prejudicial as to render the criminal trial fundamentally unfair].)

Based on this record, it is not reasonably probable appellant would have received a more favorable outcome had the trial court not permitted introduction of the CSAAS evidence. It is also not reasonably probable appellant would have received a more favorable outcome had Carmichael testified after the victim and/or Jane Doe 2 had taken the stand. Therefore, prejudice is not present even when we presume that error occurred, and this claim is meritless.

## II. The Trial Court did not Abuse its Discretion in Denying a Motion for New Trial.

In count VIII, the jury found appellant guilty of committing a lewd and lascivious act with the victim in violation of section 288, subdivision (c)(1). The verdict form listed this as the "first incident" at appellant's house when the victim was 15 years old.

Prior to sentencing, appellant filed a motion for new trial. In part, appellant asserted that insufficient evidence supported the verdict in count VIII. After hearing oral argument, the trial court denied the motion. At sentencing, appellant received an upper term of three years in count VIII, which was designated the principal term.

19.

In the present claim, appellant asserts that the trial court abused its discretion by denying the motion. According to appellant, the evidence was insufficient to support the verdict in count VIII, and the court should have vacated it.

## A. Background.

At the hearing for a new trial, the defense argued that the victim's trial testimony had established that she was at least 16 years old when the alleged sexual conduct occurred at appellant's house. The defense asserted it had reviewed the transcripts from which the jury had received readback[8] and the victim had been 16 years old.

When ruling on the motion, the trial court stated it had "carefully" reviewed the reporter's transcript and its notes about the evidence. According to the court, it had found "several instances" where the victim had testified that she had engaged in sex acts when she was 15 years old with appellant at appellant's house. The court recited the specific instances it felt established that the victim had been 15 years old. The court found that sufficient evidence existed to support the verdict in count VIII. It denied the motion for a new trial and it proceeded to sentencing.

## B. Standard of review.

" 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) When presented with a motion for a new trial, a trial court must independently review the evidence, consider the proper weight to be afforded to the evidence, and decide if sufficient credible evidence supports the verdict. (*People v. Lewis* (2001) 26 Cal.4th 334, 364.) A reviewing court will not disturb such a ruling absent a manifest and unmistakable abuse of that discretion. (*Ibid.*) Motions for a new trial "are looked upon

---

[8]    During deliberations, the jury asked for readback regarding the "first sections" from the victim's testimony regarding appellant's house.

20.

with disfavor" and an appellate court will not interfere unless a "clear showing" of abuse exists. (*People v. Williams* (1962) 57 Cal.2d 263, 270.)

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

### C.    Analysis.

Appellant argues that the victim's memories were corrupted over time from various sources, and she notes that the victim was very inconsistent in recounting the alleged instances of abuse. According to appellant, the victim's testimony during cross-examination established that only three sex acts occurred at her (appellant's) house, and all three of those occurred after the victim was 16 years old. Appellant asserts that insufficient evidence supports the guilty verdict in count VIII, and the trial court should have granted her motion for new trial.

We reject appellant's claim that the trial court abused its discretion. As an initial matter, we agree with appellant that the victim's three specific memories recounted at trial involved incidents that must have occurred when the victim was at least 16 years old. Nevertheless, the record supports the trial court's ruling.

In count VIII, the prosecution alleged that appellant violated section 288, subdivision (c)(1), and the victim was 15 years old when lewd and lascivious conduct occurred at appellant's house. To prove a violation of section 288, subdivision (c)(1), the

prosecution was required to establish beyond a reasonable doubt that appellant willfully and lewdly committed any lewd or lascivious act upon or with the victim's body, or any part or member thereof, when the victim was 14 or 15 years old and appellant was at least 10 years older than the victim, and appellant acted with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of herself or the victim.[9] (§ 288, subd. (c)(1).)

The jury learned that, on or about June 5, 1997, appellant and her husband moved from a residence on Wall Street into a residence on Hyde Street. The victim was 17 years old when appellant moved into the residence on Hyde Street. Appellant's residence on Wall Street had two floors, and her bedroom in that house was upstairs. In contrast, appellant's bedroom on Hyde Street was on the ground floor.

At trial, the victim detailed three specific incidents at appellant's house: (1) on one occasion the victim's sister *was present* in appellant's house when a sex act allegedly occurred; (2) on another occasion her sister *was not present* at appellant's house when another sex act allegedly occurred; and (3) on a third occasion appellant's husband allegedly opened the bedroom door and/or walked into the bedroom when the victim and appellant were allegedly engaged in a sex act. We agree with appellant that those three specific incidents must have occurred when the victim was at least 16 years old. These specific memories, however, do not establish that the trial court abused its discretion.

For the incident where her sister *was present* at appellant's house, the victim admitted at trial that she already had her driver's license and she drove her sister and herself to appellant's house that evening.[10] At trial, the victim's sister corroborated that memory, recalling that the victim drove her over to appellant's house for a movie night.

---

[9] Appellant was born in 1958 and she was 62 years old when she was sentenced in this matter in 2020.

[10] The victim received her driver's license when she was 16 years old.

The victim's sister saw appellant and the victim lying together under a blanket. The sister saw motions under the blanket in the area around the victim's vagina.

For the incident where her sister *was not present* at appellant's house, the victim again admitted at trial that she was driving that night. The victim first dropped off her sister at a Pac-N-Copy. The victim drove herself to appellant's house, where they allegedly engaged in a sex act. This incident stood out because the victim had a pager and her sister had paged her that night. Her sister was upset because she had waited about 90 minutes for the victim to return to pick her up.

For the final incident where appellant's husband allegedly opened the bedroom door and/or walked in when a sex act was occurring, the record amply demonstrates that this occurred when the victim was at least 17 years old. The victim indicated that this had occurred in appellant's bedroom on the ground floor in the residence on Hyde Street. We have already explained that appellant moved into the Hyde Street residence when the victim was 17 years old.[11]

Although the victim's three specific memories at trial involved alleged incidents that must have occurred when the victim was at least 16 years old, the record nevertheless supports the trial court's decision to deny the motion for new trial.

Prior to trial, the victim informed a detective that two sex acts had occurred at appellant's house when she was 15 years old. At trial, she also testified that sex acts had occurred at appellant's house when she was 15 years old. Indeed, very early in her testimony about this topic, the victim recalled that appellant had driven her. At trial, however, the victim realized that some of her specific memories involved incidents that occurred after she had turned 16 years old. Nevertheless, she testified that, before she turned 16, she had engaged in a sex act with appellant at appellant's house.

---

[11] We also note that, in her timeline prepared for law enforcement, the victim indicated that this incident occurred when she was at least 16 years old and driving.

Speaking in general about her conduct with appellant, the victim recalled at trial both appellant's residence on Wall Street and the subsequent residence on Hyde Street. The victim stated that appellant's bedroom was upstairs in the Wall Street house. When asked by the prosecutor, the victim agreed that "sexual acts" had occurred with appellant in the upstairs bedroom on Wall Street. Later, the victim described "[r]ubbing" in the upstairs bedroom on Wall Street.

During cross-examination, defense counsel asked the victim for "a general time line" regarding when appellant moved into the residence on Hyde Street. Defense counsel asked the victim, "How far before that time do you remember being at Wall Street and having some sexual activity with [appellant]?" The victim answered, "Junior high school." The victim agreed that, in general, the sexual events she was describing with appellant involved "straddling" and appellant "rubbing her vagina" on the victim's leg. However, when asked for details regarding when such activity occurred before appellant moved into the residence on Hyde Street, the victim said she could not remember and she did not know.

This record establishes that, in part, appellant was living in the Wall Street residence when the victim was 15 years old. Although the victim recalled specific details at trial about incidents that must have occurred when she was at least 16 years old, she stated before trial that sex acts had occurred at appellant's house when she was 15 years old. She also agreed at trial that sex acts had occurred at appellant's house both before and after she turned 16 years old. At trial, the victim described a sex act with appellant in appellant's upstairs bedroom on Wall Street.

The issue regarding the victim's age in count VIII was argued to the jury. Defense counsel asserted that the victim had been driving when the sex acts at appellant's house had allegedly occurred. According to the defense, the prosecution was unable to prove any of the charges. In contrast, the prosecutor reminded the jurors that the victim had

24.

described the upstairs bedroom in the earlier residence on Wall Street. The prosecutor asserted that at least some of the victim's memories regarding sex acts with appellant at appellant's home must have occurred in the Wall Street residence.

The jurors found appellant guilty in count VIII of committing a lewd act with the victim at appellant's house when the victim was 15 years old. In contrast, however, jurors found appellant not guilty in count IX of committing a *second* lewd act with the victim at appellant's house when the victim was 15 years old. Despite the victim's specific testimony about incidents that occurred when she was at least 16 years old, the jurors were nevertheless free to credit the victim's pretrial statements and trial testimony that a sex act had occurred in appellant's home before she turned 16 years old. The jurors had the exclusive province to determine the victim's credibility, and the truth or falsity of the determinative facts. (*People v. Letner and Tobin*, *supra*, 50 Cal.4th 99, 162; see also § 1127.) We must presume every inference in support of the judgment that the jurors could reasonably have made, and we will not reweigh the evidence or reevaluate witness credibility. (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*Ibid*.) As a reviewing court, we are dealing with a cold record, and we do not have the trial court's benefit of observing firsthand the appearance and demeanor of the witnesses. However, both the jury and the trial court found the victim's testimony credible for this issue. We must give proper deference to those findings. (*People v. Lewis*, *supra*, 26 Cal.4th at p. 359.)

Setting aside the victim's three specific memories, the record nevertheless contains substantial evidence supporting the jury's verdict in count VIII, and the trial court acted within its discretion to deny the motion for new trial. Indeed, appellant raised these same arguments in her written motion for a new trial, contending that the victim's three specific memories established that she was at least 16 years old when all of the sex

acts occurred at appellant's residence.  In denying the motion, the trial court rejected those arguments.

Based on this record, the trial court's ruling denying the motion for new trial does not demonstrate " 'a manifest and unmistakable abuse' " of discretion.  (See *People v. Lewis*, *supra*, 26 Cal.4th at p. 364 [setting forth the standard].)  We will not interfere with the lower court's ruling because a "clear showing" of abuse does not exist.  (See *People v. Williams*, *supra*, 57 Cal.2d at p. 270 [setting forth the standard].)  To the contrary, the entirety of the trial evidence permitted a reasonable jury to convict appellant in count VIII beyond a reasonable doubt for a lewd and lascivious act in appellant's home in violation of section 288, subdivision (c)(1).  As such, the trial court did not abuse its discretion in denying the motion for new trial and this claim fails.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.